

Eileen W. Hollowell, Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

In re:

RICHARD JAY SPREISER and KATHLEEN
ANN SPREISER,

                Debtors.

_____

ARIZONA AUTO SPA 4, LLC, an Arizona
Limited Liability Company; SCOTT N.
SHEFTEL; and DARYL ROSS,

                Plaintiffs,

v.

RICHARD JAY SPREISER and KATHLEEN
ANN SPREISER,

                Defendants.

Chapter 7 Proceeding

Case No. 4:12-bk-17553-BMW

Adversary No. 4:12-ap-01988-EWH

**MEMORANDUM DECISION**

## I.  INTRODUCTION

This case arises out of the construction of a car wash ("Car Wash") for owner Arizona Auto
Spa 4, LLC ("AAS4") and alleged misconduct by Debtor Richard Spreiser ("Spreiser").[1]  Spreiser is
one of three members of Arizona Auto Spa Management, LLC ("AASM") and the manager of AAS4.
AASM is not a member of AAS4.  Scott Sheftel ("Sheftel") and Daryl Ross ("Ross") are the other

---

[1] Kathleen Spreiser is also a defendant, but Plaintiffs only seek to hold the marital community liable.

two members of AASM, and Sheftel is also an investor in AAS4.  Plaintiffs claim they were damaged by Spreiser's conduct and that the resultant debts should be excepted from discharge pursuant to § 523(a)(4), and, alternatively pursuant to §523(a)(2)(A) or (a)(6).[2]  A three-day trial was held on March 19, 20 and 25, 2014.

For the reasons explained in the balance of this memorandum, Spreiser and his marital community cannot discharge the following obligations: $20,000 due to Ross, $20,000 due to Sheftel and $25,000 due to AAS4.

## II.  <u>JURISDICTIONAL STATEMENT</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## III.  <u>FACTUAL AND PROCEDURAL HISTORY</u>

This action concerns the construction of the Car Wash by AAS4.  AAS4 is comprised of about seven members, including Sheftel ("Investors").  Sheftel, Ross and Spreiser are business associates involved in the construction and operation of other car washes, where Sheftel and Ross provided funding and Spreiser handled the day-to-day operations, for which he earned over $200,000 per year.[3]  Sheftel and Spreiser were also friends, and Sheftel personally loaned Spreiser over $ 900,000 by the fall of 2009.

Spreiser was in dire financial straits in September 2009 due, in part, to a failed townhouse investment which was unrelated to the car washes.  Spreiser had structured a deal with his lender, Advanced Capital, to repay a $250,000 debt ("Advanced Capital Loan") in a series of balloon payments through 2011.  A default could have resulted in the loss of his house.  Sheftel loaned Spreiser $50,000 to make his first payment to Advanced Capital in September 2009.  The second

---

[2]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. § 101-1532.  "Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037.

[3]  Spreiser managed four other car washes.

$50,000 payment was due in December of 2009. Spreiser was also indebted to Eagle Rock Excavating, L.L.C. ("Eagle Rock") for work on the failed townhouse project pursuant to a $192,648.86 promissory note ("Eagle Rock Note"), which was also secured by his residence.

AAS4 was formed in October 2009, when Sheftel, Ross and Spreiser made a presentation to the Investors to solicit investments for the purpose of acquiring real property and constructing the Car Wash. The Investors were told it would take approximately $3 million to construct the Car Wash comprised of a bank loan of $2.1 million and a capital infusion of $900,000.

A written memorandum ("Offering Memorandum") was presented to the Investors which named the manager of AAS4 as AASM. In addition, the Investors were told that Spreiser was the member of AASM with the expertise to develop and operate car washes and, therefore, would be the person in charge of the construction and day-to-day operations of the Car Wash.

A. **Operating Agreements and Management Provisions**

An operating agreement for AAS4 ("AAS4 Operating Agreement"), dated October 19, 2009, provided that AASM, as manager, would have

> full, exclusive and complete power to manage and control the business and affairs of the company and shall have all the right and powers provided to a member of a "member-managed" limited liability company by law, including the power to execute instruments and documents, to mortgage or dispose of any real property held in the name of the Company, and to take any other actions on behalf of the Company, whether or not such actions are for carrying on the business of the Company in its usual way. Except as otherwise expressly provided in this Agreement, all decisions, consents, approvals and actions made by the Manager shall be binding upon all Members.

Plaintiffs' Exh. 6 at 10, § 6.2. AASM was to be paid an 8% management fee based on monthly gross receipts. Id. At 12, § 6.6.

The three members of AASM executed an operating agreement for AASM ("AASM Operating Agreement"), dated October 16, 2009. They agreed to employ Spreiser at a salary of $3,500 per month ("Management Fee") "commencing when the automated car wash facility ... opens for business." Exh. 7 at 8, § 6.6. The management powers were reserved to all three members.

> Member Managed. The Members agree that the management of the
> Company shall be vested in the Members. The Members further agree
> that the Members may designate one Member as the "Managing
> Member." It is not the present intention of the Members to designate a
> Managing Member. If the Members do not designate a Managing
> Member, all powers granted to a Managing Member or the Members in
> this Operating Agreement may be exercised by a majority vote of the
> Members.

Exhibit 7 at 7, § 6.1.

Undisputedly, the members neither executed a written document nor filed an amendment to

the AASM Operating Agreement naming Spreiser as the managing member. While Spreiser handled

the day-to-day affairs and banking, Sheftel was also a designated signatory on certain bank accounts,

and Sheftel and Ross were aware of and involved in the development process. Spreiser testified that

he would always seek Sheftel's approval for major decisions, and that Sheftel would assure Spreiser

that he would "take care of Mr. Ross." Tr., March 20, 2014 ("Tr. #2" at 12:4-18).

Member liability was set forth as follows:

> 6.5 **Liability of the Members.** No Member shall be personally liable
> for failure of the Company to make distributions as set forth in this Agreement
> and shall not be liable, responsible, accountable in damages or otherwise to the
> Company or the Members for any act or omission performed or omitted by
> such Member in connection with the Company or its business.
> Notwithstanding the foregoing, a Member shall in all instances remain liable
> for acts or omissions in breach of this Agreement or which constitute fraud,
> gross negligence, wilful misconduct or breach of fiduciary duty. . . .

Plaintiffs' Exh. 7 at 8.

There was a separate oral agreement among the Investors and the members of AASM that a

development fee ("Development Fee") of $100,000 would be paid as follows: $20,000 to Sheftel,

$20,000 to Ross, and $60,000 to Spreiser. The Development Fee was reflected in the budget, as a

construction expense, that was submitted with the Offering Memorandum. The Development Fee

was to be paid "as soon as there were funds available and not at the completion of the project."

Tr. #2 at 80:7-9. However, there was no provision or authorization for the Development Fee to be

taken from Investor funds prior to a loan for the project being in place. At trial, Sheftel was asked:

"Was there any way you could disburse that investor money before you knew you could go forward and construct the car wash?"  He answered: "No, I mean those were – my two closet friends had put in a total of $200,000 into it.  I wasn't going to use their money for something I wasn't entitled to."  Tr., March 19, 2014 ("Tr. #1" at 60:20-25.)  In addition, the Offering Memorandum provided that if $800,000 (later changed to $900,000) had not been raised by December 31, 2009, the project would not go forward and the Investors would get their money back, with interest.

**B.**    **Spreiser's Withdrawals of the Development Fee**

By December 2009, the loan which AAS4 had hoped to obtain from Wells Fargo Bank had not been approved.  By that date, the Investors had contributed $725,000 ("Investor Funds") of the targeted $900,000 equity contribution.[4]  Because AASM held the Investor Funds, Spreiser had access to them.  Spreiser's second balloon payment of $50,000 on the Advanced Capital Loan was also due in December of 2009.

Since September of 2008, Spreiser had been discussing his financial woes with Sheftel and asking for a raise or to borrow against his portion of the Development Fee.  Sheftel answered, in a September 18, 2009 email: "We can give you the whole development fee of $100k but I do feel that the compensation that Daryl and I are entitled to should be debt in the books for Wilmont [sic] and not necessarily personal debt incurred to you....let me work on it...."  Sheftel testified that his statement was part of the "initial discussions" and "[i]n no shape or form was it any entitlement or commitment to give [Spreiser] money."  (Tr. #1 at 168:7-11.)  Spreiser concurred that Sheftel's statement was part of ongoing conversations.  (Tr. #2 at 7:9-13.)

In October 2009, Sheftel told Spreiser that he would not make any more personal loans to him.  (Tr. #1 at 174:2-13.)  On December 15, 2009, Wells Fargo Bank denied AAS4's loan

---

[4]  Sheftel ultimately contributed an additional $200,000 above his original investment when Alliance Bank (the bank that ultimately funded the loan) required an increase in the equity commitment over the $725,000 raised.

application.  Eight days later, Spreiser asked Sheftel if Spreiser could use the Investor Funds to make a payment on the Advanced Capital Loan, which was secured by his house.  (Tr. #1 at 176:4-9.)

Sheftel emailed Spreiser on December 23, 2009, stating:  "Let's talk about this.  If everything bottoms out and we have to return investor money, then Daryl and I have to cover any shortages. . . . As far as needing some cash flow prior to closing, let's sit down with the books and look at where we have extra . . . Don't sweat it—we'll make it happen."  Sheftel testified that neither he nor Ross ever agreed to let Spreiser take the Investor Funds, and that Sheftel was merely suggesting, in his email, that they look for money in the other car wash businesses.  (Tr. #1 at 177-178.)

Nevertheless, Spreiser testified that he made a follow-up phone call to Sheftel after the aforementioned emails were sent, and Sheftel told him to take the money he needed to make the Advanced Capital Loan payment from the Investor Funds.  (Tr #2 at 92:16-19.)  Spreiser testified, at his deposition:  "I understood that my agreement with [Sheftel] was I would take the 100,000 and as we started making money in the new location then I would pay [Sheftel and Ross] back each their $20,000."[5]  In December of 2009, based on what Spreiser said was his agreement with Sheftel, knowing that the Wells Fargo loan had been denied, Spreiser withdrew $54,000 of the Investor Funds as part of his Development Fee as well as a $3,500 Management Fee, for a total of $57,500.  (Tr. #2 at 92:13-19 to 93:3.)

Spreiser's testimony that Sheftel consented to the withdrawal of Investor Funds in December of 2009 is not credible.  Even if Sheftel had consented, Ross testified that he did not even learn about the $54,000 withdrawal until June of 2010. (Tr. #1 at 109:16-18.)  There is no evidence that Ross ever consented to the withdrawal and there is no credible evidence that Sheftel consented to the $57,500 withdrawal.

_____

[5] Plaintiffs' Exh. 74 at 79:20-22.

## C.    New Lender and More Withdrawals by Spreiser

AASM did not return the Investor Funds after December 31, 2009, even though there was a shortfall in capital investments.  In January 2010, a new lender was found—Alliance Bank in conjunction with a Small Business Association loan.  The loan was structured in three parts: Investor Funds ($900,000), Alliance Bank construction loan, and a permanent loan from both Alliance Bank and the SBA with both loans totaling $2.1 million, for a total project cost of $3 million.  While the construction budget originally included a $50,000 contingency fund, Alliance increased it to $100,000.

After Alliance Bank looked at the construction budget that included a $100,000 Development Fee, it informed Spreiser that the SBA would not approve the Development Fee as part of the loan.  (By then, Spreiser had already taken $57,500 of the Development Fee.)  Notwithstanding the fact that the SBA would not approve a development fee, the loan was not reduced, but instead, on March 5, 2010, it was approved for $2.1 million.

The Car Wash opened on August 19, 2010.  Between January and July of 2010, Spreiser admitted to taking an additional $19,520 in Management Fees "in lieu of the Development Fee," which he counted toward what he believed was his right to the entire $100,000 Development Fee.  (Tr. #2 at 88:16-24; Exh. 53.)  Ross testified that he had no idea that Spreiser was taking the Management Fee before the Car Wash opened.  (Tr. #1 at 109:6-8.)  And Sheftel testified that he did not condone nor give approval for Spreiser to take the Development Fee out early.  (Tr. #1 at 197:3-7.)

In August of 2010, Spreiser took, as the last part of the $100,000 Development Fee, $25,000 from a $75,000 contractor refund, in order to make his next payment on the Advanced Capital Loan.  Spreiser claims that Sheftel knew Spreiser was taking this "final distribution" of the $100,000 Development Fee.  (Tr. #2 at 73:13-17.)  However, the overwhelming evidence supports Sheftel and

Ross' claim that this distribution was not authorized or condoned, and was not disclosed until the following summer when an accounting was done.

Speiser admitted to withdrawals totaling $102,020.00 in a September 20, 2010 email to Sheftel ($19,520 + $54,000 + $3,500 + $25,000). <u>See</u> Exh. 53. Speiser offered to repay the excess $2,020, but there is no evidence that he did so. He further admitted, at trial, that Sheftel and Ross were owed their Development Fee of $20,000 each.[6]

### D.    <u>Contractor Bids and $100,000 "Kickback"</u>

In the late fall of 2009, Speiser was in charge of finding a contractor for the Car Wash construction. He turned his attention to a company which had already done work for the car wash entities, Canyon Building and Design, L.L.C. ("Canyon"). Canyon is a "sister" company to Eagle Rock, the company to which Speiser was indebted, pursuant to the Eagle Rock Note. (Tr. #1 at 12:8.) Speiser worked on the Canyon bids with David Gerovac ("Gerovac"), who is an owner and managing member of both Eagle Rock and Canyon.

Canyon submitted multiple bids in the following sequence: $850,000; $776,334; $704,880 and $877,529 ("High Bid"). The construction budget submitted to Alliance Bank by Speiser listed $850,000, which Speiser testified was the first bid submitted by Canyon.[7] The final construction contract ("Construction Contract") was signed by Speiser and Gerovac, on March 5, 2010, for the High Bid, which was approximately $170,000 over Canyon's low bid of $704,880.

The month before the execution of the Construction Contract, Gerovac and Speiser executed an amendment to the Eagle Rock Note, which provided that upon completion of the Car Wash by Canyon, (1) the Eagle Rock promissory note balance would be reduced by $100,000; (2) Speiser's

---

[6] Speiser denied this was a personal liability and claimed that "according to [Sheftel], it was going to come out of the entities." (Tr. #2 at 91:6-7.) However, he could not produce an alleged email that would have confirmed his statement. Furthermore, Speiser had previously acknowledged that *he* owed Sheftel and Ross these fees. <u>See</u> Plaintiffs' Exh. 74 at 79:20-23.

[7] There is no written bid for $850,000 in the record.

personal residence would be removed as collateral; and (3) the Eagle Rock note would be extended for one year. Spreiser admitted that Canyon's bid was coupled with the $100,000 reduction ("Kickback") in the Eagle Rock Note.

Sheftel was not involved in the bid process and denied discussing Canyon's bids with Spreiser. (Tr. #1 at 118:7-18.) Spreiser testified that Ross approved Canyon's High Bid. However, Ross testified that he did not learn about the lower Canyon bids until September of 2010. (Tr. #1 at 80:19-21.)

At trial, Spreiser tried to justify his selection of Canyon's High Bid. One item was the increased cost of steel. Spreiser explained that the low $704,880 bid reflected a reduced price for steel, from $92,360 to $36,770. However, not wanting AAS4 to have any liability for inferior steel, Spreiser opted to take the High Bid in which Canyon agreed to accept the risk of liability. (Tr. #2 at 19-20.) Ross testified that there was no justification for the increase in the steel price, because the subcontractor was actually paid $37,443, which was consistent with the cost for steel included in the $704,880 bid. (Tr. #1 at 77:11-13; 79:3-4.) However, Ross did not support his statement with evidence, such as expert testimony, as to why Canyon could not choose a particular subcontractor if Canyon were assuming liability for the product. As Spreiser testified, it was not about pricing but, rather, liability.

The masonry line item in the construction budget tells a different story. Spreiser admitted, at trial, that the masonry budget had been increased by $100,000 in the High Bid in order to cover any "overages." (Tr. #2 at 67-68.) Spreiser made an oral agreement with Canyon that Canyon would refund ("Refund") whatever money was not needed for the project. The increase in the masonry contract was a "hidden" contingency of $100,000 ("Hidden Contingency"), because Alliance Bank allowed for a separate $100,000 contingency fund in the Construction Loan. (Tr. #2 at 90:3-8; Tr. #1 at 218:10-18.)

Spreiser did not keep a written record of the Hidden Contingency. Nor did he disclose it to the Investors, or Sheftel or Ross. Spreiser testified that there was a "consensus" on the Hidden Contingency because Sheftel signed the final loan documents and Ross and Sheftel knew about extra costs for an additional pay station at the Car Wash. (Tr. #2 at 82:16-23.) The trouble with that assertion is that the extra pay station was paid for with separate change orders. (Tr. #2 at 82:16-18.) Sheftel claimed he did not know about the Hidden Contingency. (Tr. #1 at 218:13-18.) Ross testified he was not told about a need for an extra contingency by increasing the masonry contract. (Tr. #1 at 37:24-25; 38:1-8.)

Spreiser maintained that he asked Ross and Sheftel about entering into the Canyon contract, which contained the Kickback, and that Ross thought it was a bad idea, but Sheftel agreed to it as long as it did not hurt the Investors. (Tr. #2 at 97:15-23.) However, Spreiser did not produce any documents to support this testimony. Furthermore, both Ross and Sheftel denied knowing about the Kickback until months later, when the existence of the Eagle Rock Note was discovered in state court litigation. Sheftel testified that such an arrangement would be "unacceptable" and would have to be explained to the Investors. (Tr. #1 at 200:15-24.) Based on the evidence and lack of documentary support for Spreiser's testimony, the Court finds that Sheftel and Ross were neither aware of, nor consented to, the Hidden Contingency or the Kickback.

The construction job came in below budget, and Canyon refunded $75,000 in August of 2010. Spreiser took $25,000 of the Refund to make his next payment on the Advanced Capital Loan. The $25,000 rounded off his total withdrawals to approximately $100,000—the amount of the entire Development Fee.

E.    **Car Wash Post-Opening: Spreiser Admissions**

The Car Wash opened on August 19, 2010. The total projects costs exceeded the $3,000,000 budget by approximately $22,000.

Spreiser had not prepared any financial reports on the Car Wash prior to July of 2010. In early September of 2010, the accountants employed by the car wash entities informed Sheftel and Ross about certain irregularities concerning the Car Wash books and records.[8] In early September, Sheftel and Ross asked Spreiser to turn over to the accountants all the company documents, books and records, which he was keeping at his house. Spreiser later turned over two computers, whose hard drives allegedly had been "wiped clean" or damaged. (Tr. #1 at 100:7-15; 143.)

Several meetings and emails ensued between Spreiser and Sheftel and Ross. Ross testified that on September 7 or 8, 2010:

> [Spreiser] showed up at my house . . . and he told me that he had had Canyon increase the contract by $200,000 . . . . that he owed them $155,000 from his townhome project, and they agreed to keep $100,000 in payment of the $155,000 debt, and that Alliance had said we weren't allowed to take a development fee out of the construction loan proceeds. So he had them write up another $100,000 so that we could get money back to pay the development fee.

(Tr. #1 at 89:24-25 – 90:1-9.)

During the first week of September, 2010, Spreiser also met with Sheftel and admitted that he had taken all of the $100,000 Development Fee. (Tr. #1 at 185:15-19.) In an effort to keep his job managing the car washes and to avoid possible criminal charges for violating the SBA's regulations prohibiting development fees, Spreiser sent out a series of emails to Sheftel and Ross asking for forgiveness and promising to repay the $100,000. He claimed he always intended to repay the money with interest. One of those emails was sent on Monday,

---

[8] Among Plaintiffs' allegations, as a result of the accounting, is a charge that Spreiser attempted to disguise his improper use of the Alliance Bank loan proceeds by falsifying an invoice to show that $16,179 more was paid to an equipment supplier than was actually paid. However, only $16,179 was actually paid to the equipment supplier and therefore no damage resulted from this alleged misconduct. As a result, the evidence concerning this allegation is irrelevant.

Plaintiffs also allege that the company's balance sheet entries showed improper liabilities of AAS4 to Spreiser in the amounts of $18,645.50 and $20,000. (Tr. #1 at 97.) Spreiser testified that these were merely bookkeeping errors and, although a $20,000 check had been issued to him, he realized the error and immediately returned the money. These amounts were not pleaded as part of the damages. Therefore, this issue is irrelevant as well.

September 20, 2010, to Sheftel in which Spreiser admitted taking a total of $102,020 from AAS4 as a Development Fee, and he agreed to reimburse AASM the $2,020 in excess of the $100,000 Development Fee.

Spreiser was relieved of his management duties for all of the car washes in mid September of 2010. At trial, Spreiser claimed that everything that happened was "contrived" and "set into motion to push me out." (Tr. #2 at 84:5-10.)

The Spreisers filed an action against the Sheftel, Ross and AAS4 ("State Court Defendants") in Pima County Superior Court on May 21, 2012, which was consolidated with an action initiated by the State Court Defendants. On July 26, 2012, the Superior Court granted the State Court Defendants' motion for summary judgment on the claims/counterclaims for breach of contract, bad faith, breach of fiduciary duty, civil conspiracy, aiding and abetting, dissolution and accounting, and defamation/slander.[9]

## F. **Bankruptcy Filing**

The Spreisers filed a voluntary chapter 7 bankruptcy on August 6, 2012. Sheftel and Ross each filed a proof of claim for $20,000, representing their portion of the Development Fee. AAS4 filed a proof of claim $113,158.71[10] based on damages sought in this nondischargeability complaint ("Complaint"), which was timely filed on November 30, 2012. The Complaint asserted counts for conversion of AAS4's funds, breach of fiduciary duty as to AAS4, Sheftel and Ross, and damages for AAS4, and further sought attorneys' fees pursuant to contract and Ariz. Rev. Stat. §12-341.01 and costs. In the prayer for relief, Plaintiffs requested a determination of nondischargeability under §§ 523(a)(2), (4) and (6).

---

[9] Neither party has asked the Court to apply issue preclusion to any of the state court findings.

[10] The Complaint does not set forth a calculation in order to determine how Plaintiffs arrived at the $113,158.71 figure.

At trial, Plaintiffs' attorney clarified that their claims fall primarily under § 523(a)(4), and are as follows: (1) the total liability alleged is $140,000; (2) the $40,000 claim represents the Sheftel and Ross portions of the Development Fee, which Spreiser allegedly embezzled; (3) the $100,000 damage claim represents an alleged defalcation by Spreiser which increased the overall cost to AAS4 under the High Bid as a result of the Kickback.

## IV.  ISSUES

1.  Whether Spreiser embezzled $40,000 of Development Fee belonging to Sheftel and Ross.

2.  Whether Spreiser had a fiduciary duty to AAS4 under § 523(a)(4).  If so, whether Spreiser committed a defalcation by allowing Canyon to increase the High Bid by $100,000 in exchange for the $100,000 Kickback.

3.  Alternatively, whether the Kickback resulted in a $100,000 debt that is nondischargeable pursuant to §§ 523(a)(2) or (a)(6).

## V.  DISCUSSION

Exceptions to discharge are to be construed narrowly and in favor of the debtor. In re Cole, 226 B.R. 647, 653 (9th Cir. BAP 1998).  "However, application of that principle is leavened by the relatively lenient preponderance of the evidence burden of proof standard applying with respect to such claims since the Supreme Court's decision in Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), and by the terms of the particular exception to discharge invoked." In re Cancelosi, 456 B.R. 515, 521 (Bankr. D. Or. 2011.)

**A.**     **§ 523(a)(4) – Embezzlement (Ross and Sheftel)**

Plaintiffs contend that Spreiser embezzled $40,000 of the Development Fee belonging to Sheftel and Ross and seek damages in that amount.  Spreiser withdrew a total of $100,000, whereas his portion of the Development Fee was only $60,000.  Spreiser maintains that he borrowed the extra funds with the consent of Sheftel and Ross.  According to Spreiser, the agreement was that he would repay the $40,000 when the Car Wash began operations.

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Embezzlement under § 523(a)(4) does not require an act by someone in a fiduciary capacity. In re Pemstein, 492 B.R. 274, 282 (9th Cir. BAP 2013).

Embezzlement is defined, for purposes of § 523(a)(4), as "the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come." In re Wada, 210 B.R. 572, 576 (9th Cir. BAP1997) (quoting Moore v. United States, 160 U.S. 268, 269 (1895)) (alteration in original). Proof of the following elements is required: (1) property rightfully in the possession of a nonowner, (2) a nonowner's appropriation of the property to a use other than which it was entrusted, and (3) circumstances indicating fraud. In re Littleton, 942 F.2d 551, 555 (9th Cir.1991).

Section 523(a)(4) fraud means "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong . . . . and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." " In re Shart, 505 B.R. 13, 16 (Bankr. C.D. Cal. 2014) (quoting Neal v. Clark, 97 U.S. 704, 709 (1878)). Fraudulent intent may be shown by circumstantial evidence. In re Fox, 370 B.R. 104, 116 (6th Cir. BAP 2007). Concealment of a misappropriation can be a circumstance indicating fraud. In re Campbell, 490 B.R. 390, 402 (Bankr. D. Ariz. 2013).

The Investor Funds were to be used for the development of the Car Wash and could also be used to pay the Development Fee, but not until a loan utilizing the equity contribution was in place. The loan was obtained in March of 2010. Spreiser admitted that, at a time when he had access to and control over the Investor Funds, he withdrew the entire $100,000 Development Fee. The evidence confirms that he did so without authorization or disclosure to Sheftel, Ross or the Investors. The first $57,500 was withdrawn in December of 2009. The next $19,520 was taken in monthly payments, starting in January 2010, as the Management Fee, which Spreiser unilaterally decided to count toward the Development Fee. Spreiser knew the Management Fee was not payable until the Car Wash

opened, which did not happen until August of 2010. Thus, even though he may have intended to pay Sheftel and Ross back with operating funds, he had already created a deficit.

Spreiser took $40,000 of the Development Fee which, he knew at the time, was reserved for Sheftel and Ross. Therefore, he embezzled money belonging to Ross and Sheftel and his $20,000 obligation to each of them is nondischargeable under § 523(a)(4).

**B.**     **§ 523(a)(4) - Defalcation**

Section 523(a)(4) excepts from discharge debts incurred by fiduciaries as a result of their defalcations. To prevail, a plaintiff must establish by a preponderance of the evidence that a fiduciary relationship existed between the parties and that the defendant committed fraud or defalcation in the course of that fiduciary relationship. <u>Pemstein</u>, 492 B.R. at 280; <u>In re Niles</u>, 106 F.3d 1456, 1464 (9th Cir. 1997). "A fiduciary commits defalcation by using trust property in a manner inconsistent with the duties and obligations imposed by the trust." <u>In re Maxwell</u>, 509 B.R. 286, 289 (Bankr. E.D. Cal. 2014).

The meaning of "fiduciary" in bankruptcy is a matter of federal law. <u>In re Hemmeter</u>, 242 F.3d 1186, 1189 (9th Cir. 2001). "[T]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt." <u>In re Mele</u>, 501 B.R. 357, 364 (9th Cir. BAP 2013) (quoting <u>In re Lewis</u>, 97 F.3d 1182, 1185 (9th Cir.1996) and citing <u>Ragsdale v. Haller</u>, 780 F.2d 794, 796 (9th Cir. 1986)).

"The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context." <u>In re Cantrell</u>, 329 F.3d 1119, 1125 (9th Cir. 2003). Thus, the term "fiduciary capacity" for purposes of § 523(a)(4) does not apply to fiduciary relationships which arise from equitable trusts, implied trusts, constructive trusts, and ordinary commercial relationships, such as those of principal/agent or debtor/creditor. <u>Id.</u> at 1126; <u>In re Baird</u>, 114 B.R. 198, 202 (9th Cir. BAP 1990); <u>In re Stone</u>, 91 B.R. 589, 593 (D. Utah 1988) .

State law is to be consulted to determine when a trust in this strict sense exists. Haller, 780 F.2d at 796. "If state law creates an express or technical trust relationship between the debtor and another party and imposes trustee status upon the debtor, the debtor will be a fiduciary under section 523(a)(4)." Baird, 114 B.R. at 202.

A "technical" trust can be statutory. A statutory trust must "define the trust res, spell out the trustee's fiduciary duties, and impose a trust prior to and without reference to the wrong which created the debt." In re Stanifer, 236 B.R. 709, 715 (9th Cir BAP 1999). Additionally, in the Ninth Circuit, § 523(a)(4) fiduciary capacity can arise from a state's common law. In re Abrams, 229 B.R. 784, 790 n. 6 (9th Cir. BAP 1999) (citations omitted), aff'd, 242 F.3d 380 (9th Cir. 2000). State case law will be examined to determine if courts impose fiduciary obligations within the meaning of § 523(a)(4). Stanifer, 236 B.R. at 718 (examining spouses' trustee duties over community property) .

Plaintiffs assert that Spreiser breached his fiduciary duty to AAS4 by obtaining the Kickback for himself which increased the cost to AAS4. In order to prevail on their claim, Plaintiffs must demonstrate that Spreiser owed a fiduciary duty to AAS4, within the meaning of § 523(a)(4), and that Spreiser, as one of three members of AASM, can be held personally liable for any wrongdoing.

In Arizona, individual members of an LLC can be personally liable for tortious conduct. See B2B CFO Partners, LLC v. Kaufman, 856 F. Supp. 2d 1084, 1093 (D. Ariz. 2012) (citing Forsyth v. Four Crown Constr., LLC, 2010 WL 2403755, at *3-4 (Ct. App. June 15, 2010)). For nondischargeability purposes, however, member liability depends on the existence of § 523(a)(4) fiduciary capacity of the LLC. See Baird, 114 B.R. at 205.

The precise issue in this multi-tiered relationship is whether Spreiser directly owed AAS4 a fiduciary duty by virtue of the duties Spreiser owed to AASM and the duties AASM owed to AAS4. See Abrams, 229 B.R. at 790 (analyzing so-called "second tier" fiduciary duty in the partnership

context); In re Eberts, 2013 WL 1248637 (C.D. Cal. March 27, 2013) (considering the fiduciary duty of a managing member of an LLC manager to the LLC).[11]

Abrams involved a debtor ("Abrams") who was a general partner of a general partner ("ABWA") of a limited partnership ("Sea Palms"). The BAP found "ample support for the proposition that ABWA, as general partner of Sea Palms, owed a fiduciary duty to Sea Palms .... [and that the debtor, Abrams], as general partner of ABWA, owed a fiduciary duty to ABWA." Abrams, 229 B.R. at 790. The BAP stated, "What is less clear is whether Abrams directly owed Sea Palms a fiduciary duty simply by virtue of the duties which flowed from Abrams to ABWA and from ABWA to Sea Palms." Id. Ultimately, the BAP concluded that the debtor, "as the general partner of the general partner of the limited partnership, was a 'fiduciary' of Sea Palms for section 523(a)(4) purposes," citing Abrams' "high degree of control over Sea Palms." Id. at 792.

The BAP relied on Haller, where the Ninth Circuit applied state case law to hold that partners in California have § 523(a)(4) fiduciary duties to one another, and on California common law, which "emphasize[s] the importance of control in establishing fiduciary duties." Abrams, 229 B.R. at 791. Then, noting the lack of California case law on the second-tier issue, the BAP extended its analysis to Texas law. In Texas, "the issue of control has always been the critical fact looked to by the courts in determining whether to impose fiduciary responsibilities on individuals whose actions directly determine the conduct of a general partner of a limited partnership." In re Harwood, 637 F.3d 615, 621 (5th Cir. 2011) (internal quotations and citations omitted) (debtor who was entrusted with day-to-day management of partnership enterprise had two-tier fiduciary duty pursuant to Texas law sufficient to meet the requirements of § 523(a)(4)) .

---

[11] This Court reviews this unreported decision for its persuasive value, in light of the sparse case law on second-tier liability. See, e.g., Olinick v. BMG Entm't, 138 Cal. App. 4th 1286, 1301 n. 11, 42 Cal. Rptr. 3d 268, 279 (2006) (noting that because California law bars only the citation of unpublished California state opinions, an unpublished District Court decision was properly citable as persuasive, although not precedential, authority); see also U.S. Ct. of App. 9th Cir. R. 36-3 (cases designated as unpublished and issued on or after January 1, 2007 may be cited to the courts of that circuit, though they will not be considered precedent).

A few years later, the California District Court, in <u>Eberts</u>, declined to follow <u>Abrams</u> and instead focused on whether an express or technical trust was created. In <u>Eberts</u>, NTF LLC was the entity set up to finance the film "Night Train." R/E LLC was a manager of NTF LLC. Eberts was a co-manager of R/E LLC and he handled the $2.5 million loan proceeds account. 2013 WL 1248637 at *2-3. Eberts effected several money transfers out of the account that were unrelated to the production of Night Train. <u>Id.</u> at *3. In Eberts' bankruptcy, NTF LLC sought to hold the debt nondischargeable under § 523(a)(4), alleging that Ebert had a fiduciary duty to R/E LLC and owed these same duties to NTF LLC. <u>Id.</u> The bankruptcy court concluded that R/E LLC's fiduciary status did not extend to its individual managers/members, and consequently, NTF LLC also failed to prove that Eberts was its fiduciary. <u>Id.</u> at *4.

The District Court affirmed, concluding that, although Eberts may have qualified as a fiduciary "in a general sense" under California law, no express or technical trust had been identified with respect to the funds. <u>Id.</u> at *6. This Court believes that <u>Eberts</u> applies more closely than does <u>Abrams</u> to Arizona LLC law. Accordingly, the existence of an express or technical trust is necessary for § 523(a)(4) fiduciary duty liability to be imposed on Spreiser.

1.   **Express Trust**

Plaintiffs contend that the AAS4 Operating Agreement created an express trust between AAS4 and AASM/Spreiser. Bankruptcy courts look to state law to determine whether an express trust exits. <u>Stone</u>, 91 B.R. at 593. In Arizona, an express trust requires a competent settlor and a trustee, a clear and unequivocal intent to create a trust, an ascertainable trust res, and sufficiently certain beneficiaries. <u>Carrillo v. Taylor</u>, 81 Ariz. 14, 27, 299 P.2d 188, 197 (1956). A manifestation of intention to create a trust is required, but no particular form of words or conduct is necessary. RESTATEMENT (SECOND) OF TRUSTS § 24; Ariz. Rev. Stat. § 14-10106 (stating that courts look to "restatement (second) of trusts) for interpretation of the common law and not to subsequent restatements").

AASM was given complete and exclusive control over AAS4's business affairs and property. According to Plaintiffs, the trust res was, initially, the Investor Funds. They contend that money to be kept or used as a separate fund for the benefit of the payor denotes a trust, citing <u>Brooks v. Valley Nat'l Bank</u>, 113 Ariz. 169, 173-74, 548 P.2d 1166, 1170-71 (1976) (citing RESTATEMENT (SECOND) OF TRUSTS § 12, cmt. g).

<u>Brooks</u> does not support Plaintiffs' argument. It held that a bank's impound fund was <u>not</u> a trust fund for the benefit of the mortgagor. The court found that, in the custom of financial institutions, no trust was intended. <u>Id.</u>, 113 Ariz. at 174, 548 P.3d at 1171. Similarly, investment funds are customarily held to be used for property development, as they were in this case. The overall rights given to, and duties imposed upon, AASM, with regards to AAS4's business affairs and property, were contractual and/or managerial provisions of the AAS4 Operating Agreement. Plaintiffs provided no other evidence of intent on the part of AAS4 or AASM to create an express trust. Neither did the AASM Operating Agreement contain trustee-like obligations and duties or identify a res. Therefore, the Court concludes there was no express trust.

**2.      <u>Technical Trust</u>**

In the Ninth Circuit, a "technical" trust is usually found in a combination of statutory and case law. <u>See, e.g.</u>, <u>Lewis</u>, 97 F.3d at 1186 (business partners); <u>In re Banks</u>, 263 F.3d 862 (9th Cir. 2001) (attorney-client relationship involving client trust funds); <u>F.D.I.C. v. Jackson</u>, 133 F.3d 694 (9th Cir. 1998) (corporate directors and officers); <u>In re Stanifer</u>, 236 B.R. 709 (9th Cir. BAP 1999) (spouses in regards to community property); <u>Baird</u>, 114 B.R. at 203 (subcontractor payment fund); <u>In re Fisher</u>, 2013 WL 241024 (Bankr. D. Ariz. January 22, 2013) (power of attorney, if money or property is entrusted to the agent).

In this case, AASM is the LLC employee-manager of AAS4. The AAS4 Operating Agreement also gave AASM the rights and power of a member of the LLC. Spreiser is a member and equal manager of AASM. Members and managers of LLCs are agents of the company. <u>See, e.g.,</u>

Barlage v. Valentine, 210 Ariz. 270, 275, 110 P.3d 371, 376 (Ct. App. 2005); Ariz. Rev. Stat. §§ 29-654(B)(2), 29-854(B). However, fiduciary capacity under § 523(a)(4) does not generally apply to agents, without more. 4 COLLIER ON BANKRUPTCY ¶ 523.10[1][d] (16th ed. 2014). Plaintiffs suggest that the "more" is evident from the level of control given to AASM and Spreiser.

One indicator of a confidential trust relationship under Arizona case law is "a superiority of position" over the beneficiary. See Taeger v. Catholic Family and Community Servs., 196 Ariz. 285, 291, 995 P.2d 721, 727 (Ct. App. 1999). Superiority of position "may be demonstrated in material aspects of the transaction at issue by a substitution of the fiduciary's will." Standard Chartered PLC v. Price Waterhouse, 190 Ariz. 6, 24, 945 P.2d 317, 335 (Ct. App. 1996) (as corrected) (internal citations and alterations omitted); see also In re Guardianship of Chandos, 18 Ariz. App. 583, 585, 504 P.2d 524, 526 (Ct. App. 1972) (managers of Chandos' estate were in a position to impose their will on him).

Plaintiffs further cite Seventh Circuit law, which has adopted a "position of ascendancy" test based on inequality in knowledge and power, as an indicator of a fiduciary relationship within the meaning of § 523(a)(4). For example, a managing partner might have superior knowledge and power in relation to a limited partner. See Catrambone v. Adams, 498 B.R. 839, 848-49 (N.D. Ill. 2013) (citing In re Frain, 230 F.3d 1014 (7th Cir. 2000)). This approach appears to be identical to Arizona's "superiority of position" test. However, the broad Seventh Circuit approach in applying state common law to § 523(a)(4), and in the absence of specific statutory duties and a trust res, has not been adopted in the Ninth Circuit.

The broad approach was addressed and rejected by an Arizona bankruptcy court in In re Chavez, 430 B.R. 890, 896 (Bankr. D. Ariz. 2010). The issue was whether Arizona law imposed a fiduciary duty within the meaning of § 523(a)(4) upon a general manager employee of a company who had misappropriated almost $500,000 in money and property from his employer. Id. at 893. While noting that other jurisdictions have held the debts of controlling managerial employees

nondischargeable under § 523(a)(4), the Chavez court found that the Ninth Circuit's narrower approach would not support such a conclusion, since no definable res had been identified.  Id. at 896; Cantrell, 329 F.3d at 1125 (adopting "narrow" definition).

The Ninth Circuit BAP has also consistently steered away from the broad approach.  See, e.g., In re Honkanen, 446 B.R. 373, 379 (9th Cir. BAP 2011) ("The mere fact that state law puts two parties in a fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4).")  The core requirements of a § 523(a)(4) fiduciary relationship are "characteristics of the traditional trust relationship, and that the fiduciary duties be created before the act of wrongdoing and not as a result of the act of wrongdoing."  In re Pedrazzini, 644 F.2d 756, 758 (9th Cir. 1981).  Even if the facts in this case demonstrated the existence of a confidential relationship between the Investors and AASM and/or Spreiser, a determination the Court does not reach because, as in Chavez, there is no res and there is no fiduciary relationship within the meaning of § 523(a)(4).

Plaintiffs also assert that Spreiser owed a § 523(a)(4) fiduciary duty to AAS4 because he "alone was responsible for performing the manager functions of AASM."  Plaintiffs' Trial Memorandum, at 3.  This assertion begs the question of whether Spreiser had §523(a)(4) fiduciary duty to AASM.  During the relevant time periods, Spreiser was one of three managing members of AASM.[12]  Assuming, arguendo, that he was the "de facto" sole manager, Spreiser owed general fiduciary obligations to AASM, however no express or technical trust existed between Spreiser and AASM for the same reasons outlined in Chavez, Eberts and the above analysis.

Plaintiffs have cited no statute or case law making members of an LLC fiduciaries, other than through an agency relationship.  Ariz. Rev. Stat. § 29-654. The Arizona LLC Act is silent and does not impose any express fiduciary duties on LLC members or managing members.  See Ariz. Rev.

---

[12] The contractor bid selection and Kickback arrangement with Canyon took place before Spreiser officially became operations manager, since the Car Wash did not open until August of 2010.

Stat. § 29-681. Rather, the LLC Act "bestow[s] the utmost flexibility on the LLC in defining the duties." 6 ARIZ. PRAC., Corporate Practice § 12:65 (Sept. 2013). There are two possible inferences: (1) that Arizona legislature intended for LLCs to be governed solely by the operating agreement, or (2) a duty is implied and is analogous to either the corporations or partnership statutes. Id. Some legal scholars believe that the Arizona legislature passed the LLC Act with the intent that they would have the same liability as corporations. R. Royal, T. Morehouse, Fiduciary Duties in Arizona Limited Liability Companies, 48 ARIZ. ATT'Y 20 (March 2012). Others question why this was not spelled out, and also see evidence that the legislature was "not looking to partnership law" either. 6 ARIZ. PRAC., supra.

This Court has not found any definitive Ninth Circuit or Arizona case law on this issue, but some unpublished decisions hold that there is no fiduciary duty among members of an LLC in Arizona. See In re Ratliff, 490 Fed. Appx. 896, 2012 WL 311887, at *3 (9th Cir. August 1, 2012); In re Day, 2012 WL 4627484, at *12 (Bankr. D. Ariz. September 29, 2012). The Court agrees with those cases. Accordingly, Plaintiffs have failed to establish that Spreiser was a fiduciary to AASM for purposes of § 523(a)(4).

Based on the foregoing analysis, AAS4 has not met its burden of establishing a "second tier" fiduciary relationship between Spreiser and AAS4 that is actionable under § 523(a)(4). Consequently, the Court need not address the issue of whether Spreiser committed a defalcation.

## C.    Was the Kickback Fraudulent Under § 523(a)(2)(A)?

To except a debt from discharge under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence, the following elements:

(1)    the debtor made … representations;

(2)    that at the time he knew they were false;

(3)    that he made them with the intention and purpose of deceiving the creditor;

(4)    that the creditor relied on such representations; and

(5)     that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010).

However, the Court need not address whether Plaintiffs satisfied the elements because they waived their § 523(a)(2) claims. The Supreme Court teaches that notice pleading requires "not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 n.3 (2007). Where no evidence or argument is presented on a count at trial, the claim will be treated as abandoned. See In re Wilson, 359 B.R. 123, 131 n.5 (Bankr. E.D. Va. 2006). In addition, the Ninth Circuit Court of Appeals generally treats issues as waived which are not raised in bankruptcy court. See In re Hoopai, 581 F.3d 1090, 1099 n.6 (9th Cir. 2009). Here, the complaint and Joint Pretrial Statement made summary mention of § 523(a)(2), but, at trial, Plaintiffs failed to pursue proof of, or to argue, the required elements of nondischargeable fraud under § 523(a)(2), focusing instead on an alleged defalcation by a fiduciary under § 523(a)(4). Therefore, the Court concludes that the § 523(a)(2) claim has been waived.

Even if Plaintiffs did not waive their § 523(a)(2) claim, they failed to prove all of its elements. Representations include fraudulent omission if a debtor was under a duty to disclose and the omission was motivated by an intent to deceive. In re Harmon, 250 F.3d 1240, 1246, n. 4 (9th Cir. 2001). But, based on the terms of the AAS4 Operating Agreement, it is not clear that Spreiser had a duty to disclose the terms of the Construction Contract to AAS4. While the evidence was disputed about whether Spreiser told the other members of AASM about the Kickback, AASM did not suffer any damages as a result of the Kickback. Also, Plaintiffs did not demonstrate at trial that Spreiser had an intent to deceive AAS4 by negotiating the Kickback.

To the extent that Spreiser intended to deceive Sheftel and Ross by taking their portions of the Development Fee, their claims have been satisfied by the Court's embezzlement ruling. AAS4 has no damages claim with respect to the Development Fee because it was always an AAS4 obligation.

Considering the totality of the evidence, the Court finds that Plaintiffs have failed to satisfy their burden under § 523(a)(2)(A).

**D.** **AAS4's Conversion Claim Under § 523(a)(6)**

Count I of the Complaint asserts that Spreiser converted in excess of $100,000 of AAS4 funds. The Complaint includes the Development Fee in its itemization of the allegedly converted funds. However, because AAS4 was always liable for the payment of the Development Fee, Spreiser's early dispersal of the Development Fee did not damage AAS4.[13]

The analysis must, therefore, focus on whether the Kickback and Spreiser's taking of $25,000 of the Refund were willful and malicious within the meaning of § 523(a)(6). First, the Court must determine if the Kickback and the Refund belonged to AAS4. If so, did Spreiser convert either or both? If he did, was the conversion willful and malicious?

Although federal law determines nondischargeability of a debt, state law govern the elements of a conversion of property. In re Thiara, 285 B.R. 420, 427 (9th Cir. BAP 2002). Under Arizona law "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it, that the actor may justly be required to pay the other the full value of the chattel." Mill v. Hehlen, 104 P.3d 193, 203 (Ariz. Ct. App. 2005) (citing Focal Point, Inc. v. U-Haul Co. of Ariz., 746 P.2d 488, 489 (Ariz. Ct. App. 1986)). To maintain an action for conversion, a plaintiff must have the right to immediate possession of the personal property at the time of the alleged conversion. Case Corp. v. Gehrke, 91 P.3d 362, 365 (Ariz. Ct. App. 2004).

The Kickback does not easily fit into Arizona's definition of conversion. The Kickback purportedly resulted in an increase in the amount of AAS4's loan from Alliance Bank. But, an increase in liability is arguably not chattel which is defined by Black's Law Dictionary as "…personal property; esp. a physical object capable of manual delivery . . ." Black's Law Dictionary

---

[13] Ross and Sheftel's claims to their portions of the Development Fee have been satisfied by the embezzlement ruling and will not be addressed under § 523(a)(6).

(9th ed. 2009). It is also difficult to see how AAS4 would have had a right to immediate possession of the Kickback.

But, even if the Kickback was a conversion under Arizona law, it does not satisfy § 523(a)(6) which requires a debt be the result of willful and malicious injury by the debtor to another entity or to the property of another entity. Whether a particular debt is for willful and malicious injury, requires application of a two-pronged test to the conduct giving rise to the injury. The creditor must prove that the debtor's conduct in causing the injuries was both willful *and* malicious. In re Barboza, 545 F.3d 702, 711 (9th Cir. 2008). "Willfulness" requires proof that the debtor deliberately or intentionally injured the creditor or the creditor's property, and that in doing so, the debtor intended the consequences of his act, not just the act itself. In re Su, 290 F.3d 1140, 1143 (9th Cir. 2002) (citing Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998)). For a debtor's conduct to be willful, he must act with a subjective motive to inflict injury, or with a belief that injury is substantially certain to result from the conduct. Id. at 1144. For conduct to be malicious, the creditor must prove that the debtor: (1) committed a wrongful act; (2) done intentionally; (3) which necessarily causes injury; and (4) was done without just cause or excuse. Id. at 1146-47.

Spreiser's act of arranging the Kickback was not "willful" because Spreiser did not have a subjective intent to injure AAS4 or the Investors when he set up the Kickback. At that time, he believed (wrongly) that he could avoid any such injury by recouping the money through the Refund generated from Hidden Contingency. Therefore, nondischargeability of the Kickback has not been established under § 523(a)(6).

However, the Refund was AAS4's property to which it had an immediate possessory right. Therefore, when Spreiser took $25,000 of the Refund, he committed a conversion under Arizona law. When Spreiser took the $25,000, he knew that the Refund would not cover the $100,000 amount of the Kickback and that the construction of the Carwash was over budget. At a minimum, he was substantially certain that his conversion would injure ASS4 which satisfies the

willfulness prong of § 523(a)(6).  His conversion was also an intentional act done without just cause or excuse which injured ASS4 and therefore malicious within the meaning of § 523(a)(6).  Accordingly, Spreiser's conversion of $25,000 of the Refund is nondischargeable under § 523(a)(6).

### E.  **Marital Community**

The Court finds that Spreiser acted, at all times, on behalf of and for the benefit of the marital community.  Therefore, any nondischargeable debt is a community obligation.  See In re Soderling, 998 F.2d 730, 733 (9th Cir. 1993); In re Rollinson, 322 B.R. 879, 881-82 (Bankr. D. Ariz. 2005).

### F.  **Attorney's Fees**

Plaintiffs seek their attorney's fees and costs, including those incurred in the state court proceedings, pursuant to the Operating Agreements for AAS4 and AASM and Ariz. Rev. Stat. § 12-341.01 (providing for attorneys' fees to prevailing party in action "arising out of a contract").

No general right to recover attorney's fees exists under the Bankruptcy Code.  In re Hosseini, 504 B.R. 558, 568 (9th Cir. BAP 2014).  Under the American Rule, attorney's fees ordinarily are not recoverable by the prevailing party in a nondischargeability action except as provided by contract or statute.  Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257 (1975).  The determinative question for awarding attorney's fees is whether the creditor would be able to recover the fees outside of bankruptcy under state or federal law.  See Cohen v. de la Cruz, 523 U.S. 213, 223 (1998) (holding that entire debt under § 523(a)(2)(A) was nondischargeable including fees awardable under state's treble damages clause). The Supreme Court, in Cohen, also cited § 523(a)(4) as an example of an instance in which damages, including attorney's fees, that exceed actual damages would be nondischargeable.  523 U.S. at 219–20.

The AASM Operating Agreement does not contain an express provisions for attorney's fees for Sheftel and Ross, or for AAS4.  The AASM Operating Agreement provides attorney's fees to the company, only, in the event of default.  The AAS4 Operating Agreement provides for attorney's fees

for the company, but only in the event of a default by a Member. Neither AASM nor Spreiser are

members of AAS4.

The embezzlement claim did not arise out of a breach of the AASM Operating Agreement, for

purposes of Ariz. Rev. Stat. § 12-341.01. Where a contract is "only a factual predicate to the action

but not the essential basis of it," a recovery under Ariz. Rev. Stat. § 12-341.01 does not lie. In re

Larry's Apartment, L.L.C., 249 F.3d 832, 836 (9th Cir. 2001) (citation omitted). The Arizona Court

of Appeals has provided a framework for determining whether a tort claim arises out of contract for

purposes of awarding fees pursuant to Ariz. Rev. Stat. § 12-341.01(A). Ramsey Air Meds, L.L.C. v.

Cutter Aviation, Inc., 6 P.3d 315 (Ariz. Ct. App. 2000). The analysis requires a court to:

> look to the fundamental nature of the action rather than the mere form of the pleadings.
> The existence of a contract that merely puts the parties within tortious striking range of
> each other does not convert ensuing torts into contract claims. Rather, a tort claim will
> "arise out of a contract" only when the tort could not exist "but for" the breach or
> avoidance of contract. When the duty breached is one implied by law based on the
> relationship of the parties, that claim sounds fundamentally in tort, not contract. In such
> cases, it cannot be said that the plaintiff's claim would not exist "but for" the contract.
> The test is whether the defendant would have a duty of care under the circumstances
> even in the absence of a contract.

Id. at 320-21.

Assuming Spreiser, as a manager and LLC member of AASM, had a general duty of care

under state law, it cannot be said that the claims for misconduct would not have existed "but for" the

AASM Operating Agreement. Therefore, the parties will bear their own attorney's fees and cost

## VI.  CONCLUSION

Spreiser embezzled $20,000 that belonged to Sheftel and $20,000 that belonged to Ross.

Therefore, each of those debts is nondischargeable under § 523(a)(4). The evidence and law do not

support a finding of second-tier fiduciary capacity between Spreiser and AAS4 pursuant to

§ 523(a)(4), which is necessary to prove a defalcation. Accordingly, AAS4 is not entitled to recover

any damages for Spreiser's AAS4's alleged defalcation. Plaintiffs did not satisfy and/or waived their

claims under § 523(a)(2)(A). Pursuant to § 523(a)(6), AAS4 is entitled to a nondischargeable

judgment for Spreiser's conversion of $25,000 of the Refund.  Separate judgments shall be entered this date as follows: $20,000 for Sheftel, $20,000 for Ross and $25,000 for AAS4, plus interest at the federal rate.  The parties shall bear their own attorney's fees and costs.  The judgments shall be enforceable against Spreiser, personally, his separate property, and all of the Spreisers' community property.

DATED AND SIGNED ABOVE.

To be NOTICED by the BNC ("Bankruptcy Noticing Center") to:

Sally M. Darcy
MCEVOY, DANIELS & DARCY, P.C.
Camp Lowell Corporate Center
4560 E. Camp Lowell Dr.
Tucson, AZ 85712
*Attorneys for Plaintiffs*

Richard M. Rollman
GABROY, ROLLMAN & BOSSE, P.C.
3507 N. Campbell Ave., Ste. 111
Tucson, AZ 85719
Attorneys for Plaintiffs

Albert L. Blankenship, Jr., Esq.
2912 N. Tucson Blvd.
Tucson, AZ 85716
*Attorneys for Defendants*

Michael J. Vingelli
LAW OFICES OF VINGELLI & ERRICO
33 N. Stone Ave., Ste. 1800
Tucson, AZ 85701
*Attorneys for Defendants*

Trudy A. Nowak, Chapter 7 Trustee
PMB #418
4802 E. Ray Rd. Ste. 23
Phoenix, AZ 85044-6417

OFFICE OF U.S. TRUSTEE
230 North First Ave., Suite 204
Phoenix, AZ 85003-1706